Orleans, so we'll hear first from Mr. Butler. Your Honor, my name is Bob Bailey, and I just wanted to announce on the record and ask for argument and defer to co-counsel for liberty. Fine. Thank you, Judge. You're not Mr. Butler either, though, right? I'm Mr. Butler. Oh, okay. May it please the Court, good morning. Good morning. Carl Butler for HANO, the Housing Authority of New Orleans, the appellant in this matter. Without belaboring the substance of the briefs that we filed in this matter, I do want to highlight three critically important issues for the panel to consider. We believe the district court erred in its decision in three respects. First, when it granted a de novo review of HANO's default of Parkcrest for not completing the project by the completion date of September 14, 2014, and in doing so, ignored the contractually specified administrative remedies. Second, when it imposed substantial completion on the entire project, contrary to the contract specifications and the recommendations of every design professional responsible for this project. And third, when it refused to enforce the clear and unambiguous terms of the surety takeover agreement executed between HANO and Liberty Mutual, which provided for liquidated damages for each day of delay to the project. As to the first issue regarding the district court's de novo review of HANO's default of Parkcrest receives virtually all of its funding from the federal government through the Department of Housing and Urban Development, HUD. Through federal regulations and contracts that govern HANO's operations, it's HUD who dictates how HANO spends its money. As HANO's prime contractor for this project, Parkcrest is also legally obligated to comply with the contracting procedures and requirements that are mandated by HUD. I think the record is clear here that Parkcrest failed to do that. This is, the contract was written by HUD, was it not? Correct. But it's interpreted in accord with Louisiana law, is that right? Under Louisiana contract principles, that is correct. Okay. So specifically looking at the general conditions for construction contracts, which is the HUD 5370 form, that is the contract that's mandated by HUD that is incorporated into every public housing construction contract that's in excess of $100,000. And the federal and state courts that have looked at that contract and interpreted that language have all consistently held that the administrative procedures and requirements in that document, in that contract, should be strictly construed and are non-waivable. So the real essence of those cases suggests that the road to the courthouse for any dispute arising under or relating to that contract, that road must first pass through the disputes clause of HUD 5370. So the contractor has no right to litigate any dispute or any claim arising under or relating to that contract unless it first submits a claim to the contracting officer for the public housing authority and obtains a written decision. But that's section 29 of the contract, is it not? 28 or 29 on change orders? 29 is changes to the contract, correct. Right. But this action has been interpreted to fall under 32, which is termination of the contract. That is correct, Your Honor. Well, how do you get from the disputes provision in 29 to termination? And why doesn't 32 provide the rule of decision here? Well, 32 does provide the rule for decision here, and that is the essence of our argument, Your Honor, is that 32B is the provision of the contract that required Parkrest, the contractor, to file its notice of delay in order to avoid being terminated by the housing authority. They didn't do that. They were defaulted by the housing authority. They failed to file a notice of delay, which would have been a precursor to a delay claim. And by not filing that notice of delay, that claim never made it to the disputes clause. So a claim was never filed under the disputes clause because they didn't satisfy those prerequisites in the default clause. So what Parkrest did was decided to walk into court after it was terminated in April of 2015 and filed suit seeking declaratory relief against Hano, challenging the earlier unchallenged default. Now, Parkrest could have triggered the disputes clause by doing one of several things. It could have filed a written notice of delay within 10 days of the start of any of these alleged delays that they were claiming had delayed them on the project. They could have submitted a proposed change order seeking additional time to the completion date of the contract. They could have filed a claim in writing with the contracting officer, contesting the default that was issued by Hano. Or they could have documented a delay claim for a specified number of excusable delays to the project. They did none of that. Parkrest failed to take any of those actions. And Parkrest and Liberty, their surety in this case, both admit that no claims were ever filed, ever submitted to the contracting officer under the disputes clause, and no written notice of delays was provided to support a delay claim. Therefore, the contracting officer here for the Public Housing Authority never had the opportunity to conduct the contractually mandated investigation and render a written decision as to any of the delays that Parkrest was alleging caused them to be delayed on the project. So it is clear that Parkrest understood the process and even realized that it had an obligation to do something. So on September the 12th, 2014, two days before the completion date, Parkrest sent to Hano's project manager, not the contracting officer, the project manager, a letter entitled Notification of Delays. That letter alleged several excusable delays and also promised additional documented support as well as a proposed change order that would have extended the contract time. But Parkrest failed to deliver on any of the promises made in that letter and never provided any documentation to the contracting officer to support the impact or extent of any of the delays that they were alleging in that letter. Even after they were defaulted on September 15th of 2014, even after that default, Parkrest never administratively contested their default. Even during the next eight months that Hano allowed them to remain on the project working toward its completion. Were they paid? They were paid. So really this appeal really has to do more with the $437,000 verdict, right, against Hano? Yes, and it also has to do with the way the contract was interpreted by the district court. The fact that the district court allowed the contractor to ignore these mandated administrative procedures before it was able to walk into court seeking a judicial review of an earlier default by the housing authority. So this appeal, in fact, speaks to the importance of these mandated procedures that the contractors required to comply with, which in this case Parkrest did not do. So in May of 2015, again, Parkrest walks into court and seeks judicial relief when in fact he had failed to comply with these administrative requirements before. So Hano is now asking this court to simply enforce the entire contract as written, which means that Parkrest waived any right to judicial review of its default when it had previously failed to comply with these administrative procedures and requirements. The district court's decision essentially endorsed that. It endorsed Parkrest's disregard of those administrative procedures that it had agreed to under the contract with Hano. More precisely, it said that Hano waived compliance with those provisions. The district court did make that finding, Judge, and of course there is no support for that finding. The district court's finding that Hano had waived its right to receive notice was based on the fact that Hano representatives attended weekly meetings for this project. There were many discussions about many issues, including delays to the project, which had occurred since 2013 when this project started. So Hano shows up at these meetings and has these discussions, but the contract requires the contractor to make written claims, to document issues, to follow a process for getting decisions from the contracting officer, and that was never done in any respect with regard to any of the delays that were alleged on this project by the contractor. So the district court's finding that Hano waived a contractually mandated requirement by simply showing up at weekly meetings to discuss the project was simply an error. Was the contracting officer at the weekly meetings? The contracting officer was not at the weekly meetings. The contracting officer had designees who were in attendance at the weekly meetings, yes. But apparently there are Louisiana cases, I'm sorry to say, but I had this experience in Texas also that say that even these notice provisions can be waived. And we've looked at those cases here in Louisiana. None of those cases involve federal projects. None of those cases that we've looked at here in Louisiana involve federal contracting forms. So we think that's a distinguishing factor, and it's an important distinguishing factor here, because, again, this appeal is about the sanctity of those forms and the importance of these federal projects being governed by mandated federal forms, which is why the implications for the district court's decision in this case is so wide ranging. There's little doubt about that. So we've cited the case of Crown Coat, which is a Supreme Court case, where the reasoning of that case supports Hano's position in this case, and that is that the HUD 5370 disputes clause is there for a reason, and it's there for the public policy reason of essentially allowing public housing authorities to adjust and correct these contract disputes, these project issues on an administrative level, thereby mitigating damage claims and avoiding the cost of litigation on these projects. And that's the reasoning that was applied by the Supreme Court in the Crown Coat case, where it considered very similar language in disputes clauses and default clauses in a government contract. And the court there acknowledged the importance of the contractual scheme that provides for this administrative mechanism that needs to be complied with before a contractor can actually walk into court seeking relief. Here the district court committed legal error when it disregarded that administrative mechanism and by also ignoring the written notice requirement in 32B and allowed Parkhurst to essentially bypass the contract's administrative mechanism and submit a claim to the contracting officer before it was allowed to proceed to court. So the district court gave Parkhurst the benefit of a de novo review of its earlier default by Hano, even though it failed to either submit a timely written notice of delay, even though it never submitted a claim for excusable delays, even though it never requested a change order seeking additional time, and even though it didn't bother to even contest the default by Hano earlier in September 2014. So instead of complying with these available agreed-upon procedures, Parkhurst decided to walk into court. So the reality that's been created here by the district court's decision is that now a contractor like Parkhurst is given an unqualified right to proceed with the work on the project, and Hano is restricted and limited to only a termination for convenience. It can't terminate for default under this scheme. So that eliminates any possibility for Hano to recover liquidated damages from the contractor, and Hano loses the ability to enforce a completion date for the project, and that's what we had here for eight months. The contractor got an indefinite extension of time to continue working, continue being paid, but Hano had no ability to enforce the completion of that project. Why did the district court do this? This is a very good district judge, okay, and there are arguments that you're making that are defensible here. Why did the district court do this here? In effect, the district court rewrote the contract and in some ways perhaps didn't understand the interplay between the disputes clause and the default clause. I think the argument that's been made from the other side is that the claim that Hano, that Parkhurst filed was a claim for declaratory relief. It was not a claim that in fact arose under or related to the contract that was subject to the disputes clause, and I think the court adopted that position, but that position is wrong. This is a claim that relates to the contract. It arises under the contract. It's a claim about the default of the contractor and the fact that the contractor did not seek the proper delay to the project through the procedures provided. So this is a claim that relates to the contract. It arises under the contract, and it should be a claim that was directed through the administrative process, which it did not do, and so what the district court did was essentially carved a hole in the middle of the contract and said that this disputes clause doesn't apply, that any notice that Hano would have been entitled to under 34B of the contract or 32B of the contract would have been essentially waived, and therefore we don't have to go to the disputes clause because there's no reason to file a claim. So I do think it represents a misunderstanding of the interplay between those two clauses, but it's a significant modification of a very important federal contractual requirement that should be reversed by this court. As to the second issue, the substantial completion issue, the court here imposed substantial completion. We're very sorry, but your red light is on. Just in closing, again, the substantial completion issue is another issue that we briefed in our brief, as well as the takeover agreement and the attorney fee issue and the compliance with the DBE WBE requirement have all been briefed. If need be, we'll allow you to raise those on rebuttal. Thank you. All right, thank you. Mr. Krebs? David Krebs, Your Honors, for Liberty Mutual. Judge King, the reason Judge Barbier ruled the way he did was he sat there seven days and heard the evidence. If you look at his findings of fact and conclusions of law, they are careful, they are footnoted, they are amply supported by the record. What we have here is, in my view, a faux legal argument that this is somehow subject to federal contracting law, which it is not. The public housing authority is a state agency. This is a public contract. This is governed by state law. Now, that said, Judge Jones, I agree, at least with the inference that I took from some of your questions, I've spent my life as a surety lawyer. I believe in notice provisions. They're often all that I have as a defense. These notice provisions were waived, and it's important, I think, to focus on which notice provision was waived. There are, as Judge Jones pointed out, there are two provisions here. There's Section or Paragraph 29 and Section 32. Twenty-nine has to do with equitable adjustment of the contract. Twenty-nine has to do with the contractor saying— Well, to be quite—to be precise about it, it talks about contract changes, and maybe I'm reading it too narrowly, but what it says is the contracting officer may at any time without notice by written order make changes in the work within the general scope of the contract, including changes, colon, one, in the specifications, two, in the method or manner of performance, three, PHA furnished facilities, four, directing the acceleration in the performance. So you think that requests for an additional time would have been changes in the method or manner of performance? I mean, I don't see—what I'm saying is I'm not sure that 29 applies to this situation at all. Nor do I, Judge. Nor do I. But I'm—and perhaps I was getting too granular or maybe not granular enough. But they're separate. It has to do with changes. I think of changes in terms of public contracts as requests for equitable adjustment, which is why I use that term. It has to do with changes, and they are separate mechanisms, separate concepts, and separate mechanisms. And you see that when you look and you see that under 29E, the notice required is 30 days. Under 32B, which has to do with termination, it's 10 days. They're different provisions. What we are dealing with here is an improper termination of Parkcrest first and then after Liberty took over of Liberty. Under 32B, it states—it essentially states, if I can generalize, that the contractor is not to be defaulted for delays that are beyond its control. And it qualifies that in B2 to say and written notice, right? My problem is not paragraph 29. My problem is 32B2, which is written notice. Yes, why didn't Parkcrest ever give a written notice? I think, Your Honor, and this would be speculation on my part, but I think if you look at the course of the contract and the evidence that came in in seven days of trial, I think Parkcrest quickly got into a mode where it was just trying to get out with its skin. It wasn't looking—it wasn't thinking, I'm going to get extra time, I'm going to get relief. I think what they were doing, though, was they were working collaboratively. I know they were working collaboratively because I sat through that trial, too, working collaboratively to try to get the project complete and informing Hano of the delays. Now, I say that the notice was not given. The judge applied—Judge Barbier applied the proper provision, but he found as a matter of fact that the waiver existed. The law is clear, as Judge Jones noted, both in Louisiana and nationwide, that these clauses can be waived. You're talking about 32B, notice. I am, Your Honor. I'm sticking within the context of this appeal. The court found in the finding of Fact 125, Parkcrest repeatedly updated Hano of the delays it was experiencing at the project, and Hano was aware of all delays experienced by Parkcrest. There are extensive findings of fact, footnoted by the judge, that this provision was satisfied through Hano's actual knowledge of delays. The judge talks about the sewage and water board delay. He finds as a finding of fact—I think it's 107. I don't have it written here, but I think it's 107. Not only were they aware of the delay, but their contracting—the project manager had asbilts that would have prevented the delay and did not give them to Parkcrest, but Parkcrest withheld them because he didn't want to give support to a claim for extra time. The energy delay. They actually analyzed the delay. They analyzed it in-house. They came to the conclusion that Parkcrest likely was entitled to time and didn't give them any. The roof delays. This affected us. They gave a change order finally on the roof on August 12th, five days after the takeover completion date of August 7th. We didn't even get the change order until after the completion date, and they defaulted Liberty two days later on August 14th, although the judge found that change order extended the time through November. And there's a final point I want to make. Judge Barbier found in finding of fact 61, and I'm quoting, Hano's conduct throughout the takeover period and the project as a whole, including inter alia, its unreasonable and uncooperative administration of the project, constituted a prevailing cause of delay to the project's completion. When you are dealing with a poisonous project like this, this begs a question to me. Where the project is being delayed essentially continuously by little things. You're like the frog in the water that is heating up. When do you give that delay? And how do you give that delay? Because the little things that add up and make it impossible to perform individually and by themselves may not constitute a cause. So what we have here is we have a public owner that knows the project is being delayed. It is. Well, you're arguing very nicely on the equities of the case. Yes, Your Honor. But Judge Barbier also made some findings such as that Parris, the architect, and its subcontractor ILSI were agents of Hano when the contract specific between Parkcrest and Hano specifically says they're not agents. Yes, Your Honor. But I think that was ‑‑ Do we overlook that? You're not going to defend the entire reasoning of the district court there, are you? I'm going to defend the basis of the reasoning, yes, Your Honor. Yeah, well, you're back to your equity argument. Well, no. But I'm not, Your Honor, because what I'm back to is 32B. I'm back to the contract because I'm back to the fact that these were people who had separate contracts with Hano and that their actions clearly delayed the contractor through no fault of his own. He didn't control Parris. He didn't control Parris. I would also say ‑‑ I would also ‑‑ I'd also point out, Judge, that in the case of Parris, despite that contractual relationship, and I want to emphasize here, I think agency is irrelevant to these arguments. That's contrary to what the district court said. Yes, Your Honor. I didn't agree that it tied to agency. I think it ties to 32B of the contract. But, Judge, leaving aside what the contract says and going back perhaps to equity, but also, I think, to tort, they can disclaim agency, but the district court found a ‑‑ what did he call it? An unusual and not improper, but something like that, relationship between Hano and the architect. Where Hano, where Kennedy, the project manager, was ghostwriting the architect's letters. Kennedy was ghostwriting them and the architect, who, as the judge points out, was not a licensed architect, was signing them. Hano was making these decisions, not the architect. Now, we haven't gone into that in great detail in our brief because we rely on the contract. We rely on the contract, which is properly applied by the judge, and on the waiver argument. And the ‑‑ once you get to waiver, Your Honor, they have to show clear error. And I think under the facts we just stated that they can't show error.  There's another point, and that is the delays in obtaining the revised site drawings. And they say that that delay was caused only by Parkcrest because it did not pay for those site drawings until September 2014. And there is simply ‑‑ Is that true or not? That is not true. That is not true, Your Honor. And I am looking for my reference here. All right. That was a pure credibility determination. Michael Stewart, the principal of Parkcrest, testified that he followed up regularly with the Sewage and Water Board. The Sewage and Water Board plans were not approved until September 2014. The stamp plans themselves back him up. They show a stamp of September 2014. What you're referring to, Judge Jones, was testimony by Nick Clark, who was one of the design professionals, who said that they were ready in 2014, but on cross‑examination, he admitted that he had never gone to the Sewage and Water Board to try to pick up the plans. He had no personal knowledge on the issue. And Hannah's entire assignment on this point rests on a mischaracterization of the man's testimony because they simply say, as Your Honor just said, they say that that's when the fee was paid. But that is not what Nick Clark said. And this was under hot cross‑examination. The stamp on the revised drawings indicates when the fee was finally paid, not when the drawings were prepared or approved. That's what Hannah says. His actual testimony was he only, quote, thinks that it represents when the process was completed with Sewage and Water Board so the fee was paid and the plans were issued. So this testimony was subject to sustained objection at trial that Clark lacked personal knowledge of this whole process. And at the end of the day, in weighing the testimony, Judge Barbier believed Stewart. And there's no reason to overturn that. So, Your Honor, I'm a little concerned. I'd like to move on quickly to the other two points that Mr. Butler said he wanted to make, particularly if he's going to raise them in rebuttal. I would like to address those just quickly. The district court in finding the project substantially complete, that was based on evidence of certificates of occupancy, Hano's own DOFA certification to the federal government that the project was substantially complete by December 31, 2015, opinions held by Liberty and Parkcrest architectural expert Mr. Watts, who specifically opined, in his estimation, the project was substantially complete as of December 2015. Contemporaneous video evidence. We had videos of all of each and every apartment that were introduced into evidence. Does that mean they had fixed the roof problem and they had fixed the backsplash overlapping the electrical outlet problem and they fixed all that by December 15? Yes, Your Honor. The project was complete by December 15. Well, it was substantially complete. I won't say it was finally complete, but those are different, distinct concepts. What Hano hangs its hat on are the streets. And, again, it's a mischaracterization of Ilse's testimony. If you look at those videos, you will see residents driving on those streets. Those streets were substantially complete. They had not been finally accepted by the Department of Public Works. That is not substantial completion. Schuman, who was Ilse's representative, the design professional's representative, testified that his review of the streets was for final acceptance, not substantial completion. Hano then, when COMEX completed the work, Hano issued a certificate of substantial completion to COMEX, although COMEX was in the very same position that Parkrest had been. The streets were done. People were driving on them, but they had not been accepted by the DPW. Okay. All right. What's your other point? The takeover agreement, Your Honor, I would have liked to have heard what Mr. Butler was going to say because the argument in the brief confuses me somewhat, but the takeover agreement incorporates the construction contract. It's entered into after the default of Parkrest. It's a fairly standard document used by sureties, and the idea is it lets sureties come in and complete work when projects are still under dispute. So you do the takeover agreement. You say, all right, a couple of things are going to be modified. Normally we try to get them to give up a little bit of liquidated damages, but at the end of the day, if you go through the takeover agreement, one, it incorporates terms and conditions of the contract with any amendments, modifications, or change orders. Two, it says, as to performance and completion of the contract, the surety is entitled to all of the rights of the contractor in and to the agreement. And ten, it says, except as provided for herein, the agreement shall not diminish or have any adverse effect on any rights, claims, actions, or defenses between the owner and surety. All such claims, actions, and defenses are reserved. So the idea is we're going to complete according to the construction contract, and we're going to fight about it later, which is what we've done and why we're here. With that, Your Honor, I think I have— Let me ask you back on this waiver business. Yes, ma'am. It seems to me that your argument on waiver is collapsing 32A, the first and the second clauses of 32B, which is to say that you're saying that the delay was attributable to causes unforeseeable to Parkcrest, but the B, Hano was waiving the requirement of ten days' notice because Hano was one who was responsible, ultimately, for many of the delays. You see what I'm saying? In other words— I do, Your Honor, but I'm not sure I agree. If I look at 32B.1, the delay in completing—it says, the contractor's right to proceed shall not be terminated, nor the contractor charged with damages, if, one, the delay in completing the work arises from unforeseeable causes beyond the control and without the fault or negligence of the contractor. Then it goes on to give examples. And then, two, is when it graphs on the notice provision, and it says the contractor within ten days, unless otherwise indicated from the beginning of such delay, notifies the contracting officer in writing of the causes of delay. That is the clause which Judge Barbier found was waived. I understand that, and the reason it was waived was because he was finding over and over and over again that Hano or its, quote, agent were responsible for the delay. Or that— In other words, if you're the—right? And this is—but this is where I disagree, Judge, because I think what he was finding was that Parkcrest was not responsible for those delays. I don't have to show that Hano was responsible. I have to show Parkcrest was not. I understand that, and you either have to show that Parkcrest complied with the notice requirement or that the notice requirement wasn't effective here. Or that it was waived. Well, that's one means of doing that. But your waiver argument is the same as—I'm just saying this. I mean, I think— Well, I see what you're saying, Judge. Same as your unforeseeable delay argument, whereas I—and again, I haven't— I have citations to those Louisiana waiver cases. I haven't seen them. But is there testimony in the record where Parkcrest said, well, you know, this is taking a lot longer than we expected, or, you know, this sewage problem is causing us to be unable to complete the contract on time? Well, there is—yes, Your Honor. There is—and the judge found that as a finding of fact. There is plenty of evidence that that was the subject of ongoing verbal discussion and was essentially rejected by Hano. Well, rejected or not, I mean, there has to be more to the waiver than the fact that Hano mismanaged the contract, in my view, legally speaking, because otherwise you've just eviscerated the notice requirement. And what I'm struggling with, Judge, is I agree with you, but I don't think that that's what I'm saying. Because if you look, for instance, at Bruner O'Connor—and I see I'm out of time— but Bruner and O'Connor is like—is a construction lawyer's wigmore. It's on everybody's shelf. Everybody uses it. They're two construction lawyers in Minneapolis. And they discuss this. They say, An owner's right to timely notice may also be deemed waived if the owner, in fact, was aware of the condition, conducted its own investigation into the merits of the claim without raising lack of timely notice, or cannot prove that it was prejudiced by lack of timely notice. Carl—Mr. Butler went to this in his oral argument. He said that he never had—that Hano was denied the opportunity to conduct an investigation, and that's what the notice provision is for. And I agree that's what the notice provision is for, but they conducted an investigation. They knew. They absolutely knew. And so if—I can see why Your Honor feels like I'm conflating these things, but I really don't believe that I am. So thank you, Your Honor. Thank you. Okay, Mr. Butler. Thank you, Your Honor. Judge King, I want to speak to the question you asked earlier about what the district judge here did. And I do think that Mr. Krebs has essentially answered the question, and I just want to emphasize that because the district judge felt that Hano had not properly managed the project for whatever reason, it became a justification to rewrite the contract. And, again, I think that's where we differ here about what the result was. The contract is still the contract. Mr. Krebs indicated that— Back you up just a minute. Repeat what you just said. The district court felt that Hano hadn't— —mismanaged the project on the ground, and because of that the district judge decided to rewrite the contract to provide the contractor with some measure of relief. But to do that, the contract had to be ignored in some respects. Mr. Krebs pointed to the fact that there was a lot of working collaboratively between Hano and the contractor. Even if they were working collaboratively, that doesn't relieve the contractor from complying with the contract as written. There were requirements, there were procedures that had to be honored, and those were not honored by the contractor here. Well, were they honored by Hano? I mean— Yes, we believe they were. —involved in these situations where both sides are sort of, in effect, rewriting the contract. I mean, it isn't just one side. It's hard to rewrite a contract when you're only one party to it. Wasn't this a situation where Hano was also involved in rewriting this contract, and the district court zeroed in on the fact that this was kind of a mutual redo? I understand the question, Your Honor. I just don't think there were any findings to that effect, that Hano had done anything. What I'm trying to figure out is how we got here, given the scenario, and if basically the district court was persuaded that, in effect, both sides rewrote this contract as they went along, and so he was trying to accommodate that concession on both sides' part. I understand. I don't know, but this is a good judge, and he listened to all this testimony, and he somehow may have landed on a version of the contract that's somewhat at odds with the original contract. But the ultimate issue here for the contractor was how do we get an equitable adjustment to the contract time, and there was a procedure for doing that, and that procedure was not followed. So they sought a declaratory judgment that the contract was not terminated for cause, right? I mean, you don't really have any claim against Parkcrest. Your claim is against liberty for the ultimate delay, right? Under the bond, correct. Our claim is ultimately against liberty under the bond that it provided for the performance of the project. So you don't have a claim against Parkcrest here? Well, our claim against Parkcrest is the claim for the termination of the project. We defaulted Parkcrest for its failure to complete the project on time. But you said they never contested the default. And they didn't. But then they started this litigation, didn't they, by suing for a declaratory judgment? Correct. That's what's been mystifying me. Parkcrest initiated the litigation because of the termination for default. Right. And again, Handel's claim is against liberty and Parkcrest because they took over the project to complete it, and that also did not materialize. Right. So as to the takeover agreement, which was a valid and enforceable contract between Handel and Liberty, we believe the court erred when it failed to enforce that agreement, the takeover agreement that came after the termination and after the lawsuit, and it allowed Liberty to escape liability for the liquidated damages that were due to Handel under that contract. That takeover agreement specified that the contract completion date was August 7, 2015. Liberty and Parkcrest failed to comply with that completion date. The project was not completed as of August 7, 2015. The fact that the district court converted Parkcrest's termination from one of default to one of convenience doesn't change the fact that Liberty still owed a duty to Hanno to fulfill its obligations under the clear and unambiguous terms of that takeover agreement. So we think that this court should look at that decision and reverse the district court on its decision to eliminate the liability for Liberty to pay liquidated damages to Hanno under the terms of that contract. The other issue was substantial completion. Again, what we see here is what we've not seen in any other case regarding substantial completion. Here, the district judge imposed substantial completion on a project against the recommendations of every design professional that was responsible for this project. Nowhere else have we seen a court do what the district court did here. Louisiana law is clear. Substantial completion is the finishing of the construction in accordance with the contract documents to the extent that the public entity can use or occupy the public work for the use it was intended. This project was intended to be a residential neighborhood, not just a collection of buildings. It was a neighborhood where people would drive their vehicles on the streets, the children would play and ride their bikes on the sidewalks. As of December 31, 2015, when the court imposed substantial completion, this project could not be used as a residential dwelling, as a residential neighborhood. Unfortunately, the court didn't see it that way and found the project to be substantially complete as of December 31, 2015. But it was undisputed that the city inspectors who inspected the project only inspected the buildings. They did not inspect the non-building infrastructure. They didn't inspect the streets, the sidewalks, the ramps, the curbs. They didn't inspect for compliance with ADA and UFAS access requirements to the buildings. Even the Department of Public Works for the city of New Orleans could not accept, could not recommend that Hanoi accept this project as substantially complete because of these deficiencies in the sidewalks and the streets, curbs and ramps. There was extensive remediation work that was still yet to be done before these streets and this non-building infrastructure could be dedicated to the city of New Orleans. Importantly, in this case, Liberty had an on-site construction consultant, Mr. Jack Lenhart, who testified by way of his deposition in this case, a trial, that he did not think the project was substantially complete in December. And he didn't even think that it was substantially complete in May of 2016 because there were still outstanding code violations throughout the project which were not completed by Liberty or Parkrest prior to them leaving and abandoning the project in June of 2016. Here, the District Court granted substantial completion contrary to the law and contrary to the recommendations and the refusal to recommend substantial completion by all of the design professionals on the project. Okay. Well, we have your argument. Thank you. All right. Thank you very much. It's a complex case. We'll do the best we can with it. And we will be in recess until 9 o'clock tomorrow morning.